UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                              No. 02-4921

DYRON LAQUEE RUSH,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CR-02-46)

Argued: December 5, 2003

Decided: March 15, 2004

Before LUTTIG and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Joseph Lanny Ross, II, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Chris-
tine Witcover Dean, Assistant United States Attorney, Raleigh, North
Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal
Public Defender, Stephen C. Gordon, Assistant Federal Public
Defender, Raleigh, North Carolina, for Appellant. Frank D. Whitney,
United States Attorney, Anne M. Hayes, Assistant United States
Attorney, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

On July 24, 2002, appellant Dyron Laquee Rush was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He contends on appeal that the district court committed reversible error by refusing to instruct the jury on a defense of justification to this crime. We hold that the district court did not err in refusing the instruction. Accordingly, we affirm Rush's conviction.

### I.

Viewed in the light most favorable to the defendant, the circumstances surrounding his arrest and conviction were as follows.

On the night of December 5, 2001, the defendant was visiting with his sister, Diresha Rush, at her house, when Kowan Curry, the father of his sister's children, arrived. The defendant and Curry spoke amicably for a short period of time before the defendant received a telephone call and left, leaving Curry alone with his sister. Curry and Diresha Rush began to fight almost immediately thereafter. The fighting between Curry and Rush turned violent, and, at some point, Curry punched Diresha Rush in the face.

The defendant returned to his sister's house shortly after he left because he had forgotten his cell phone. As he approached, he heard fighting and saw Curry knocking his sister against the back door to the house. The defendant intervened immediately, putting himself between his sister and Curry. Curry then made threats against the defendant himself, and the defendant responded by pinning Curry against a wall. The ruckus that followed attracted a crowd of people from the neighborhood, including relatives of Dyron and Diresha Rush and friends of Curry. Various members of the crowd then attempted to defuse the situation by calming Curry down and encour-

aging him to leave, which he eventually did. However, before Curry got into his car, he hollered, "I'll be back. This ain't over. You'll see." J.A. 109. After Curry drove away, the defendant left the house again.

Diresha Rush next called the police. Officer Joseph Cina responded to her call and followed her to the state magistrate's office so that she could take a warrant out against Curry. After Rush obtained the warrant, she was followed home by both Officer Cina and Officer Reichard, who was driving a second police car. During the drive, Diresha Rush pointed out to the officers a black Nissan Altima, which she identified as belonging to Curry. The officers followed her the rest of the way to her house and returned immediately to the car Diresha Rush identified.

As the officers neared the parking lot where the car had been parked, they saw the car pulling out onto the road. Moving quickly, the officers turned on their blue lights and blocked the car in by positioning their vehicles in front of and behind it. The driver of the car unsuccessfully attempted to "seesaw" his way out from between the two police cars. The officers then exited their cars. As they approached the Altima, they realized that there were two men in the car. Curry was in the driver's seat and an individual, later identified as the defendant, was in the passenger's seat.

Officer Cina noticed that the individual on the passenger side appeared to be slumped over and have his head in his hands. The passenger then looked at Cina, looked back down, and began fumbling around on the floorboard of the car, as if he had dropped something. Officer Cina ordered him out of the car. After several commands, the defendant opened the car door, stepped out of the vehicle slowly, and then took off running. Officer Cina followed in pursuit and eventually tackled the defendant in the middle of the street a block and a half away. Cina handcuffed him and had begun to pat him down when he asked if the defendant had anything on him. The defendant replied that he had a gun "in his front area." J.A. 36. Officer Bordeaux, who had arrived to assist Cina, then took custody of the defendant and found a loaded Taurus revolver in the front, "hand warmer" pocket of the defendant's sweatshirt. Officer Bordeaux testified that, as he moved the defendant to his police car, the defendant was irate and that, once in the police car, he attempted to kick out the windows.

The defendant testified at trial to explain the circumstances surrounding his arrest. According to this testimony, the defendant was walking down the sidewalk an hour and a half after the fight between Curry and his sister, when he saw Curry approaching in his car. The defendant flagged Curry down to find out whether he had calmed down from the fight and "to make sure that he wasn't going to put further harm on [his] sister." J.A. 134. Curry pulled over and the defendant voluntarily got into his car. The defendant testified that Curry was still "hyped up about what happened earlier." J.A. 118. The first thing that Curry told the defendant was, "Man, I'm tired of your sister, man, she always trying to play me." J.A. 112. Curry then told him, "Well, she going to pay. I'm tired of her trying to play me. She going to pay." When the defendant asked Curry what he was going to do, Curry responded, "You're going to see." The defendant testified that Curry "stopped at that point. He never did say at that point what he was going to do right then." J.A. 119.

The defendant then asked Curry for a cigarette and was told to look in the console, which was located between the driver's seat and the passenger's seat. When he opened the console, the defendant testified that he saw Curry's gun and took it. Curry became more angry and shouted at the defendant that he, "couldn't stop him from doing what he [Curry] was going to do, that ain't the only gun ever made." J.A. 121. Curry next put the car in gear and attempted to pull onto the road, at which time his car was boxed in by Officers Cina and Reichard. The defendant testified that, at most, he was in Curry's car for three minutes before the police arrived.

Based on this evidence, the defendant requested that the district court instruct the jury on a defense of justification. The district court refused, on the grounds that the defendant's sister did not face a "physical immediate threat of harm" and that the defendant did not take the first available lawful action to avoid the threat of harm that did exist. The defendant appealed.

## II.

As a general rule, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Matthews* v. *United States*, 485

U.S. 58, 63 (1988). Without ever holding that a justification defense is available for defendants accused of violating section 922(g), *see United States* v. *Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989) (declining to "rul[e] on the general availability of the common law defense of justification in possession of a firearm by a convicted felon cases"), we have, nevertheless, adopted from our sister circuits the following test for determining when a court would be required to give a jury instruction on a justification defense:

> [T]he defendant must produce evidence which would allow the factfinder to conclude that he:
>
> (1)  was under unlawful and present threat of death or serious bodily injury;
>
> (2)  did not recklessly place himself in a situation where he would be forced to engage in criminal conduct;
>
> (3)  had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and
>
> (4)  a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Crittendon*, 883 F.2d at 330. As is implicit in this quotation, the defendant must present evidence sufficient to support a jury verdict on each of the four elements. Moreover, the elements themselves are to be interpreted "very narrowly." *See United States* v. *Perrin*, 45 F.3d 869, 875 (4th Cir. 1995).

Because we hold, as a matter of law, that the defendant did not satisfy the first or the third elements of a justification defense, we affirm the district court and decline once again to reach the question of whether such a defense would be available if the defendant had satisfied each of its elements.

Turning to the first element, the defendant does not contend that *he* was under a threat of harm; rather, he argues that his actions were justified due to the threat of harm to his sister. Although the test, as fash-

ioned in *Crittendon*, appears only to extend to threats against the defendant himself, we agree with the defendant that, if justification is a viable defense at all, there may be limited circumstances in which it would be a viable defense for threats against third parties as well. *See United States* v. *Newcomb*, 6 F.3d 1129, 1136 (6th Cir. 1993) (listing cases from other circuits). Thus, we assume that were the defendant's sister subject to death or serious bodily injury, the defendant's action in her defense would be no less justified than if that action were taken by the defendant to protect himself. *See, e.g.*, *United States* v. *Paolello*, 951 F.2d 537, 540-41 (3d Cir. 1991) (holding that a jury instruction on a justification defense was warranted where the defendant seized a gun from a man actively attacking his stepson).

Nevertheless, we affirm the judgment of the district court because we conclude that Diresha Rush was not "under unlawful and present threat of death or serious bodily injury" at the time that the defendant seized the gun in Curry's car. As the defendant himself testified, at the time that the defendant took Curry's revolver, Curry had not said anything that indicated that he intended to cause "serious bodily injury" to Diresha Rush or that the actions he was planning were imminent.[1] After Curry told the defendant that Diresha Rush was "going to pay" for "trying to play" him, the defendant testified, "[h]e stopped at that point. He never did say at that point what he was going to do right then." J.A. 119. In fact, Curry explicitly avoided making a particular threat against Diresha Rush, telling the defendant only that, "[y]ou going to see," in response to the defendant's question about what he was going to do.

While these vague remarks may have sparked a rational fear on the part of the defendant and might have even been his real motivation for seizing Curry's gun, *see Crittendon*, 883 F.2d at 330, we hold that they did not place Diresha Rush under a "present or imminent threat of . . . serious bodily harm," such that the defendant was required to respond to an "immediate emergency," to ensure her well-being, *see*

---

[1]The only evidence that Curry intended to use a gun to harm the defendant's sister came *after* the defendant had seized the gun, when Curry excitedly told the defendant that he, "couldn't stop him from doing what he was going to do, that ain't the only gun ever made." J.A. 121.

*United States* v. *Bell*, 214 F.3d 1299, 1301 (11th Cir. 2000). The defendant acted in response to his own apprehensions about unspecified actions that Curry might take, *not* in reaction to particular threats that Curry actually made. Indeed, from Curry's remarks, it is unlikely that Curry himself knew what he was going to do to make Diresha Rush "pay." As we held in *Crittendon*, such "generalized fears," untethered to any specific, threatened harm, are simply not sufficient to satisfy the first element of the justification defense. *See Crittendon*, 883 F.2d at 330. Therefore, we hold that, on this ground alone, the district court was correct to deny the defendant's request for a jury instruction.

The defendant also failed to present sufficient evidence to support a jury verdict on the third element of the justification defense, that he "had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm)." *Crittendon*, 883 F.2d at 330. Even prior to the arrival of Officers Cina and Reichert, the defendant was faced with several "reasonable legal alternative[s]," which did not include the illegal possession of a firearm and which would have succeeded in mitigating the threat against his sister. For example, when Curry told the defendant that he planned to make Diresha Rush "pay" and the defendant saw that Curry had a gun in his car, he could have gotten out of Curry's car, which was parked at the time, and called either his sister or the police (or both) on his cell phone to let them know about Curry's apparent intentions. And, of course, after the police arrived, the defendant could have alerted the officers to the threats that Curry had made and handed over the revolver then in his possession. Instead, he chose to flee the scene and fight violently against arrest. *Accord United States* v. *Gomez*, 92 F.3d 770, 777-78 (9th Cir. 1996) (holding that a jury instruction on a justification defense was warranted where both the police and the Customs Service ignored the defendant's pleas for protection and, for that reason, the defendant was forced to arm himself). The defendant's reaction may have been motivated by his knowledge that he was forbidden by law to possess a firearm, but this fact has no bearing on the question of whether there were "reasonable legal alternatives" to the defendant's criminal act. As recounted above, there clearly were, and, for whatever reason, the defendant decided against taking them. Therefore, for this reason as well, the defendant could not prevail on a defense of justification.

## CONCLUSION

Without deciding whether the justification defense would be available to a defendant accused of being a felon in possession of a firearm, we hold that the district court was not in error to deny such a jury instruction in this case, because, even assuming the availability of the defense, the defendant failed to present evidence to support a jury verdict on either the first or the third element of the defense.

*AFFIRMED*